Argued and submitted November 1, 2007, affirmed March 5, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JILLIAN L. EDWARDS-PEECHER,
*Defendant-Appellant.*

Washington County Circuit Court
D053379M; A130565

179 P3d 746

Garrett A. Richardson argued the cause and filed the brief for appellant.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant appeals a judgment of conviction for criminal mischief in the second degree, ORS 164.354, and for recklessly endangering another person, ORS 163.195. The issue on appeal is whether the trial court erred when it excluded a statement made by defendant's teenaged son to defendant's investigator that he, rather than defendant, shot out a neighbor's glass door with an air rifle. The trial court ruled that there was insufficient corroborating evidence under OEC 804(3)(c) to admit the son's statement into evidence. On appeal, defendant assigns that ruling as error. To the extent that there are disputed issues of fact on which the trial court ruled, we accept the court's findings as long as they are supported by evidence in the record. However, the issue of whether the trial court properly excluded the evidence under the rule is a question of law. *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006). Applying those standards of review, we affirm for the reasons expressed below.

The state's evidence demonstrated the following. Defendant and the victim were involved in a romantic relationship. On the night of July 10, 2005, they had drinks together at a local bar and made plans to have dinner together that night at defendant's apartment, which was in the same apartment complex. After the victim did not show up for dinner, defendant went to his apartment. When the victim, in his underwear, opened the door to his apartment in response to defendant's inquiry and defendant saw the victim's ex-girlfriend in the room, defendant became upset and began to yell and curse at the victim and his ex-girlfriend. The victim shut the door on defendant. Defendant returned to the bar, where she was heard to say that "she was mad and that she was going [to] destroy [the victim's] truck, destroy his car, [and] destroy his motorcycle."

Later that evening, defendant returned to the victim's apartment. She was angry and intoxicated, and she yelled at the victim. The victim asked defendant to leave and closed his door. At around 12:45 a.m., defendant's friend and neighbor, McLaughlin, found defendant passed out, lying outside in the grass. McLaughlin put defendant to bed in defendant's apartment, where, at that time, defendant's

son and his friend were playing video games. At around 1:10 a.m., McLaughlin testified that she heard a "shoop, shoop, shoop [sound] about three or four times" but that she did not hear any glass shatter. She opened the door to defendant's apartment and saw "the boys aiming [a] pellet gun up at [the victim's] apartment." She told the boys to put the guns away and to go to bed.

At approximately 1:30 a.m., the victim awoke to the sound of an air rifle firing, and a sliding glass door, two feet from his bed, shattered. The victim called his apartment manager, who then called the police. Tigard police officers responded to the call, and the victim directed them to defendant's apartment. Defendant's son answered the door. Officer Rollins described him as "calm," as if it was "a routine night for him." Rollins asked the son whether defendant was home, and the son indicated that she was in her bedroom. Rollins then asked whether there were any BB or pellet guns in the residence, and the son indicated that two pellet rifles were in his bedroom closet.

After taking possession of the pellet rifles, Rollins found defendant in her bedroom. Defendant was lying on her bed, fully dressed, and appeared intoxicated. Defendant asked why Rollins was in her apartment. Rollins responded by asking defendant why she thought he was there, and defendant replied that she did not know. Rollins then asked defendant whether she had "shot out the glass window, the glass door," and she responded, "Yeah, I shot out the window." Rollins asked whether she had used one of the pellet rifles to shoot out the window, and she responded, "Okay, I used the gun to shoot out the window." Rollins then asked defendant to show him where she had shot from. She went outside, eventually telling Rollins, "Yeah, I was up close when I did it." While outside with the officer, defendant became extremely agitated and began swearing and making obscene gestures in the direction of the victim's apartment. Eventually, Rollins placed defendant under arrest.

While Rollins was interviewing defendant, another officer interviewed defendant's son. At the time, the son was calm and articulate. There is no evidence about whether the son was asked if he fired the shots that damaged the door.

Rollins attempted to arrange for McLaughlin to take temporary custody of defendant's son. She, however, did not answer the door or respond in any way to Rollins's knocking on the door or ringing the doorbell.

Defendant was charged with menacing, second-degree criminal mischief, and reckless endangerment. A defense investigator, Neumann, contacted the son by telephone, identified herself as working for defendant, and asked him what had happened on the night of the incident. In the conversation with Neumann, the son said that he, and not his mother, had shot out the victim's glass door:

> "And basically, I just asked [the son] what happened that night, and [the son] told me that during that night his mother was getting a little bit drunk. They were at the house. And she's getting a little bit angry because she realized that [the victim] was with another woman. So [the son] said he was trying to calm her down and basically he hid the BB gun, the BB gun and the pellets, so she wouldn't have access to them.

> "Then [defendant] called [McLaughlin] at her bar and went to the bar for a couple of hours. And during that time [the son] said he and his friend in this case shot the BB guns at [the victim's] window, but they didn't make contact at that time. * * *

> "* * * * *

> "Okay. So [defendant] came back from the bar and was pretty intoxicated at that point. At that point [McLaughlin] put her to bed. [The son] and [his friend] were still up and again they took out the BB guns again and shot at [the victim's] window and this time they did make contact.

> "* * * * *

> "[H]e explicitly stated that his mom did not use the BB gun."

At trial, defendant's defense was that her son had shot at and broken the victim's sliding glass door. After opening statements, it became apparent that defendant intended to have the son testify that he was the one who shot out the victim's glass door. After consulting with independent counsel, the son invoked his privilege against self-incrimination,

making him unavailable to testify. Defendant then offered Neumann's testimony about the son's statement, asserting that it was admissible under the statement-against-interest hearsay exception embodied in OEC 804(3)(c). The trial court disagreed and excluded the son's statement, reasoning that the statement was not clearly corroborated so as to make it trustworthy:

> "And under [OEC] 804(3)(c), I do not find that the evidence that is presented is of sufficient corroborating circumstances to indicate the truthfulness or the reliability of the statements against criminal liability or criminal interest. The statements that you're going to be offering from your investigator were made well after the incident. They were made to the investigator of his mother's case. They were not made to an independent third party. There were not made to a police officer or anyone else that didn't have a vested interest in the outcome of the matter. He's a 13-year-old child living with his mother. And therefore, I do not find that under [OEC] 804(3)(c) that that is sufficient.

> "* * * * *

> "The trustworthiness comes from [the son's] reasons for changing a story from taking no responsibility at the time that the officers were there, taking no responsibility at all for it until he talks with his mother's attorney's investigator. And that the corroboration is not that [ ] McLaughlin saw her—saw [the son] shooting the pellet gun, she saw [the son] lift the pellet gun. The time line is unclear to me as to whether or not it happened before the 1:30 time or after the 1:30 time. The time line has not been adequately established for me to know exactly when she saw him with the pellet gun."

After the state and defendant presented their evidence, the jury found defendant guilty of criminal mischief in the second degree and recklessly endangering another person but not menacing.

On appeal, defendant renews her argument that the circumstances surrounding her son's statement sufficiently corroborate it for purposes of admission under OEC 804(3)(c). OEC 804 provides, in part,

> "(3)   The following are not excluded by [OEC 802] if the declarant is unavailable as a witness:

"* * * * *

"(c)   A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*"

(Emphasis added.) Thus, as we have previously explained, "to establish the admissibility of exculpatory hearsay statements under [OEC 804(3)(c)], the proponent must establish three elements:

" '(1)   The declarant must be unavailable to testify as defined under OEC 804(1); (2) the statements must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statements unless he or she believed them to be true (the penal interest requirement); and (3) *there must be corroborating circumstances that clearly indicate the trustworthiness of the statements.*' "

*Wood v. Baldwin,* 158 Or App 98, 102, 972 P2d 1221, *rev den,* 329 Or 61 (1999) (quoting *State v. Schutte,* 146 Or App 97, 101, 932 P2d 77 (1997)) (emphasis added).

Defendant contends that

"testimony of McLaughlin is sufficient corroboration for the introduction of [the son's] statement to Neumann, * * * because McLaughlin clearly stated that she saw [the son] with the rifle and heard the 'shoop[,] shoop[,] shoop' of the gun after McLaughlin had put the intoxicated defendant to bed. McLaughlin testified that she saw [the son] pointing the rifle at the [victim's] window, and the court did not rule that McLaughlin was giving false testimony."

The state responds that "[t]he dominant fact is that the purported confession, itself, was not trustworthy[,] * * * [because of] the timing and circumstances of [the son's] purported confession, coupled with his relationship to defendant[.]"

According to the legislative commentary to OEC 804(3), the rule is a codification of a common-law rule:

"A statement against interest carries a circumstantial guarantee of reliability, because people generally do not make statements that are damaging to their interests unless they believe they are true.

"* * * * *

"The common law refused to concede the adequacy of penal interest in large part because it distrusted evidence of confessions by third persons offered to exculpate the accused. This reflected a suspicion that either the fact or the contents of the confession were fabricated, enhanced in either case by the required unavailability of the declarant. To meet that concern, [OEC] 804 requires that a statement against penal interest be corroborated. This requirement must be satisfied prior to admission, see [OEC] 104(1), as the situation after an accused offers such a statement is not well adapted to control by rulings as to the weight of evidence. *The trial court should construe the corroboration requirement in a manner that effectuates its purpose to circumvent fabrication.*"

Legislative Commentary to OEC 804(3)(c), *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 804.04[2] (5th ed 2007) (emphasis added).

■■ There is no magic formula to determine whether the corroboration requirement under the rule has been satisfied; each case must be decided on its own individual circumstances. *State v. Lytsell*, 187 Or App 169, 180, 67 P3d 955 (2003). In this case, there are a number of circumstances that support the trial court's conclusion. As the trial court explained, "[h]e's a 13-year-old child living with his mother" and dependent on her for his support, thus giving him a motive to fabricate. Moreover, it is not clear from the offer of proof that the son, given his status as a juvenile, understood at the time of his statement to his mother's investigator that he could incur legal liability. Also, there is no evidence that the son told the officers when they came to his apartment that he was the person who had shot out the door; rather, the purported statement was made after his mother was charged. Those circumstances give rise to a reasonable inference that the son belatedly fabricated the statement that he

gave to the investigator in an effort to assist his mother's defense.

On the other hand, defendant relies on McLaughlin's statement that she saw the son pointing the rifle at the victim's door at around the time that the window was damaged. Significantly, however, McLaughlin did not testify that, when she heard the sound of the rifle, she also heard glass breaking. Indeed, the victim awoke to the shattering of glass two feet from his bed at approximately 1:30 a.m., whereas McLaughlin's observation occurred approximately 20 minutes earlier. But in defendant's view, the time-line issue and McLaughlin's testimony sufficiently corroborate his statement such that the statement should have gone to the jury.

Defendant's argument is resolved by the language of the rule itself, which requires that the "corroborating circumstances *clearly* indicate the trustworthiness of the statement." (Emphasis added.) The word "clearly" in the context of OEC 804(3)(c) means "1 : in a clear manner * * * 2 : *of something asserted or observed* : without doubt or question." *Webster's Third New Int'l Dictionary* 420 (unabridged ed 2002). Also, as the proponent of the above evidence, defendant was required to establish the element that there are corroborating circumstances that clearly indicate the trustworthiness of her son's statement. *Wood,* 158 Or App at 102.

We agree with the trial court's conclusion that defendant did not establish that there were corroborating circumstances that clearly indicated the trustworthiness of the statements. Our conclusion is prompted by the relationship between the son and defendant and the timing of the statement.[1] Although defendant offered some evidence that the statement was trustworthy, the weight of that evidence is

---

[1] By far, the greater weight of authority has held that declarants' statements exculpating a relative are untrustworthy. *See* John A. Bourdeau, Annotation, *When Do Corroborating Circumstances Clearly Indicate Trustworthiness of Hearsay Statement Tending to Expose Declarant to Criminal Liability and Offered to Exculpate Accused, so as to Permit Admission of Statement Under Rule 804(B)(3) of Federal Rules of Evidence,* 125 ALR Fed 477 § 14 (1995).

insufficient to satisfy the statutory standard that the corroborating circumstances clearly demonstrate the trustworthiness of the statement.

Affirmed.