Argued and submitted February 19, 2009, reversed and remanded
January 27, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JOSE GUADALUPE CAZARES-MENDEZ,
aka Leonardo Cruz-Casarez,
*Defendant-Appellant.*

Washington County Circuit Court
C052532CR; A136094

227 P3d 172

Daniel J. Casey argued the cause and filed the brief for appellant.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals a judgment of conviction and sentence of life without parole stemming from the burglary, robbery, and murder of Jessie Valero. After a jury trial in which the state sought the death penalty, defendant was convicted of seven counts as follows: two counts of aggravated murder, based on defendant's intentional killing of the victim to conceal the identity of the perpetrator of robbery (Count 1) and burglary (Count 2), ORS 163.095(2)(e); intentional murder (Count 3), ORS 163.115(1)(a); two counts of felony murder, based on defendant's killing of the victim "in the course of and in furtherance of" the crimes of robbery (Count 4) and burglary (Count 5), ORS 163.115(1)(b); first-degree robbery (Count 6), ORS 164.415; and first-degree burglary (Count 7), ORS 164.225. Defendant raises multiple assignments of error. Because it is dispositive, we write to address defendant's contention that the trial court erred in excluding hearsay statements offered by the defense to show that a third party, Tiffany Scherer, had killed the victim. We conclude that the trial court so erred and that the error was not harmless. Accordingly, we reverse and remand for a new trial.[1]

Given the jury's verdict in this case, we "state the facts that the jury was permitted to hear in the light most favorable to the state." *State v. Thoma*, 313 Or 268, 270, 834 P2d 1020 (1992). On the morning of March 17, 2005, a relative discovered Valero's body on the living room floor of her apartment in Hillsboro. Valero had died from 29 stab wounds. Aside from the contents of her jewelry box, which were strewn over her bed, her apartment was clean and in order. A gold pendant depicting the Virgin Mary was missing from her possessions.

On August 22, 2005, defendant and two other men, Jorge Reyes-Sanchez and Jose Lugardo-Madero, were charged with Valero's murder and related crimes. Like defendant, Reyes-Sanchez was charged with two counts of aggravated murder, ORS 163.095(2)(e), intentional murder,

_____

[1] That disposition obviates any need to consider defendant's other assignments of error, which pertain to various rulings made during the guilt phase of his trial that may or may not reoccur on remand or may be presented in a different posture, and asserted errors in sentencing.

ORS 163.115(1)(a), two counts of felony murder, ORS 163.115(1)(b), robbery in the first degree, ORS 164.415, and burglary in the first degree, ORS 164.225. Lugardo-Madero was charged with two counts of felony murder, robbery in the first degree, and burglary in the first degree. Reyes-Sanchez's trial commenced January 10, 2007. By the time defendant's trial began, on March 13, 2007, a jury had convicted Reyes-Sanchez of charges related to Valero's murder, including aggravated murder.[2] Lugardo-Madero was scheduled to go to trial in May 2007.

At defendant's trial, Lugardo-Madero testified for the prosecution. Lugardo-Madero testified that, on the evening of March 15, 2005, he had accompanied defendant and Reyes-Sanchez to Valero's apartment complex. On the way to Valero's apartment, defendant informed Lugardo-Madero that "we were going to break into an apartment" to steal jewelry. It was understood that they would then attempt to exchange the stolen property for methamphetamine. Lugardo-Madero told defendant and Reyes-Sanchez that he did not want to go in and offered to wait outside. At some point, Lugardo-Madero got tired of waiting and approached the apartment. He heard a loud noise, became frightened, and left to go to the apartment of a mutual friend.

Lugardo-Madero further testified that, later that night, defendant arrived at the apartment where Lugardo-Madero was, bathed himself, and laundered some of his clothes. Another witness also saw defendant throw some clothes into the dumpster outside. Another witness testified that, sometime before sunrise that same night, she had seen defendant with blood on his hands and Reyes-Sanchez with blood on his pants. According to Lugardo-Madero, when he next saw defendant a week later, defendant told him that he and Reyes-Sanchez "had killed the lady" and threatened that, if Lugardo-Madero told anyone, "[t]he same thing could happen to [him]."[3]

---

[2] Reyes-Sanchez appealed his convictions, assigning error to, *inter alia*, the exclusion of "alternative perpetrator" hearsay evidence closely similar to, but not identical to, that proffered and excluded in this case. That appeal is pending in this court. *State v. Reyes-Sanchez* (A136062).

[3] Defendant cross-examined Lugardo-Madero on his motive to cooperate with the prosecution. Lugardo-Madero admitted that he hoped that, by cooperating with

Sometime after Valero's murder, a witness saw defendant with a gold pendant depicting the Virgin Mary. Several other witnesses testified that they saw Reyes-Sanchez with the pendant in the days and weeks following Valero's murder. A witness who eventually obtained the pendant testified that it came from Reyes-Sanchez and that, later, Reyes-Sanchez asked that the pendant be returned to him because it "belonged to the lady that got murdered."

While investigating the crime scene, the police found a red bicycle that Reyes-Sanchez had stolen inside Valero's apartment, blocking the front door. At least one witness also saw defendant and Lugardo-Madero with the bicycle. The police also discovered a screwdriver with a yellow handle behind the victim's apartment building that had been sharpened to a point and which, forensic testing later revealed, had trace amounts of Valero's blood on it. At trial, the state offered testimony from witnesses who had seen defendant and Reyes-Sanchez with similar screwdrivers, including one who had seen defendant with a yellow-handled screwdriver like the one found at the murder scene on the day of the murder. However, no DNA, fingerprints, or other forensic evidence connected defendant to the murder scene.[4]

During the defense's case at trial, but outside the presence of the jury, defendant proffered evidence that another person, Tiffany Scherer, had killed the victim. Specifically, as part of an offer of proof, defendant presented testimony from four witnesses—Connie Torres (C. Torres), Naomi Rivera, Lisa Smith, and Jessica Callahan—who recounted statements by Scherer in which Scherer, with varying degrees of detail, had admitted that she had stabbed

the prosecution, he might receive a plea offer for a reduced charge or a sentence less than the potential life sentence he was facing for felony murder.

[4] The state also presented evidence pertaining to defendant's motive for the crime, *viz.*, to obtain property to trade for methamphetamine. Defendant frequently traded stolen property, including car stereos, for methamphetamine, but also occasionally was able to obtain methamphetamine from his drug dealer on credit. According to the state's evidence, on the day of the murder: (1) defendant and Lugardo-Madero went looking for a car that they intended to break into; (2) when they were unable to locate it, defendant tried to persuade his drug dealer to give him methamphetamine on credit; (3) when that failed, then the two met up with Reyes-Sanchez at his apartment, and the three of them proceeded to Valero's apartment, where the murder took place; and (4) later, defendant sought out his drug dealer to buy methamphetamine.

a female victim to death. After each witness testified, the trial court permitted the state to cross-examine the witness on her testimony.

In addition to the four hearsay witnesses, defendant also proffered, as corroborating evidence, the testimony of Benilde Torres (B. Torres) and Hillsboro Police Detective Patrick Brady. B. Torres testified that she saw Scherer with a scratch on her neck about two or three days after she learned of Valero's murder. Brady testified that there were no other murder cases in Hillsboro in March 2005 involving a female victim who had been stabbed multiple times.

Finally, as part of his offer of proof, defendant called Scherer. As amplified below, Scherer denied either murdering Valero or making the self-inculpatory statements recounted by the four hearsay witnesses.

Defendant contended that, notwithstanding that Scherer was available to testify, the hearsay testimony recounting her admissions, as corroborated by other evidence, must be admitted to show that she, not defendant, had killed Valero. Because the testimony of the four hearsay witnesses is central to our analysis and disposition, we describe that testimony in detail.

C. Torres testified that, about a week after she learned of Valero's death in the paper, she encountered Scherer "underneath [her] friend's truck, * * * listening to music, acting like a little baby," and "rocking back and forth." According to C. Torres, she approached Scherer to see what was wrong and brought her inside, where "[Scherer] just— she broke down * * * [a]nd * * * started crying." Scherer then told C. Torres that "she killed somebody, she killed a girl"— and, specifically, that "[Scherer] and this girl were fighting," that the argument escalated, and that "once she started * * * she couldn't stop," "[s]he stabbed her."

C. Torres further testified that Scherer said that after she stabbed the "girl" to death, she got scared and tried to make it look like a burglary. Scherer told C. Torres that others were involved in the cover-up, but C. Torres "didn't ask for any names." C. Torres acknowledged that Scherer never identified who she had stabbed, but she was able to

"put two and two together" and connect Scherer's account to Valero's murder. After Scherer confessed to her, Scherer "disappeared for a while," and C. Torres did not see her again until "a couple of months" later.[5]

On cross-examination by the state, C. Torres admitted that, although her encounter with Scherer was about a week after Valero's murder, the first time she disclosed Scherer's purported statements to the defense or the authorities was in the middle of Reyes-Sanchez's trial, in January 2007, nearly two years later. According to C. Torres, she came forward after she learned that the state was seeking the death penalty against defendant and Reyes-Sanchez: "I don't think somebody who's not guilty of doing something, I don't think they should get the death penalty for something that they didn't commit themselves."

There is no evidence in the record that C. Torres had any relationship to defendant or his alleged coperpetrators, Reyes-Sanchez and Lugardo-Madero. Conversely, C. Torres testified that she was friends with Scherer and had "known her about five years." She also claimed to be friends with Scherer's mother, Tina, whom she had known for "about fifteen" years. Additionally, C. Torres testified about her relationship with Valero, whom she claimed to have known for "20 years or so" by virtue of her relationship with Valero's family.

Rivera, the second hearsay witness, testified that, two or three months after she learned of Valero's murder, Scherer told her that she had stabbed a woman "over and over and over again." Scherer did not identify her victim by name, but Rivera testified that "it wasn't too hard to figure out who she was talking about." Scherer reportedly told Rivera that she and the woman had gotten into an argument "at [Lugardo-Madero's] birthday party," which the woman

---

[5] C. Torres and Scherer were both regular methamphetamine users. However, C. Torres claimed that neither she nor Scherer were using methamphetamine at the time Scherer made her purported admissions. On cross-examination, the state confronted C. Torres with a statement she purportedly made to a police detective, to the effect that "she and [Scherer] were both using meth during the time [Scherer] told her this information." C. Torres denied making any such statement and insisted that the detective "must have misunderstood what I said."

had hosted at her apartment.[6] According to Rivera, Scherer claimed that the woman was drunk, and that she "stabbed her" after "[t]hat bitch * * * [came] at [her] with a knife."[7]

Rivera testified that she had known Scherer for about three years and that Scherer "was a friend that [she] did drugs with," but that they had used drugs together only "a few times." According to Rivera, at the time Scherer made her admissions, both she and Scherer were using methamphetamine at the apartment of Scherer's mother's boyfriend, Dale. She also acknowledged that she and defendant were friends and that she had known him since he had come to Oregon.[8]

On cross-examination, the state impeached Rivera using prior inconsistent statements that she had made in a prior police interview. In particular, Rivera acknowledged that she had previously told a detective that she "didn't remember anything significant occurring around [Lugardo-Madero's] birthday in 2005"—and, in response to the court's follow-up questioning regarding her testimony, also as part of an offer of proof, in Reyes-Sanchez's trial, explained that "[n]o one asked me or said anything about—no one asked me anything." Rivera first disclosed Scherer's purported admissions to law enforcement authorities on December 13, 2006, over a year and a half after Scherer allegedly made those statements and less than a month before Reyes-Sanchez was scheduled to go to trial.[9]

---

[6] According to Rivera, Scherer told her that she had been staying with a person named "Jessie" and that the argument that Scherer described occurred at that person's apartment.

[7] Rivera claimed that she was not sure, based on what Scherer said, whether the stabbing occurred "during [or] after" the birthday party.

[8] There is no evidence in the record that Rivera had a prior relationship with Reyes-Sanchez or Lugardo-Madero.

[9] Later, also as part of his offer of proof, defendant called Brady, who had interviewed Rivera on December 13, 2006, to testify to prior consistent statements that Rivera made in that interview and rebut the state's inference of recent fabrication. Although much of what Brady testified to was consistent with Rivera's trial testimony, there were also significant differences (in addition to those differences adduced by the state in its own cross-examination of Rivera). According to Brady, Rivera had stated that Scherer had confessed to her "about a week or less" after Valero's murder, and that they were using methamphetamine at Scherer's mother's house, not Dale's apartment. Additionally, according to Brady, Rivera had stated that Scherer had told her that both she and a woman named "Jessie" had

Defendant next offered the testimony of Smith. Smith was a long-time family friend of Scherer's. Smith testified that she had known Scherer "pretty much her whole life" and that she "know[s] her whole family." She claimed to have grown up with Scherer's mother and aunt, to know her grandparents, and to have lived with various members of Scherer's family. Smith claimed that she "[s]omewhat" considered herself a surrogate mother for Scherer, when Scherer "wasn't locked up," and that Scherer sometimes called her "mom" or "Aunt Lisa." As was the case with C. Torres, there is no evidence in the record that Smith had any prior relationship with defendant, Reyes-Sanchez, or Lugardo-Madero.

At the beginning of her testimony, Smith stated that "I went through like some really traumatic things in treatment lately, so my memory is not really good right now"—and thereafter offered repeated qualifications that her memory was faulty. With those qualifications, Smith testified that she, Scherer's cousin, Nicki, and another person, Angel, had confronted Scherer "a couple of months" after Valero's murder, after hearing rumors that she was the one responsible. According to Smith, she had "asked [Scherer] if she killed Jessie," and "[Scherer] told me, 'Yes.' " Smith testified that "[she] told [Scherer] what [she] had been hearing, and [Scherer] told [her] that they had got in a fight." According to Smith, Scherer "sa[id] that they left the [Cooler] tavern and went back to Jessie's house," where the stabbing purportedly took place, and that "[Scherer] t[old] me that she stabbed [Jessie] 22 times, but I'm not real clear." Scherer also told Smith that, later, she "sent somebody back to rob the apartment."

Smith further testified that either Scherer or Nicki had told her that "Jessie" had gone into convulsions or a seizure during the stabbing. Earlier testimony in defendant's case had established that Valero suffered from epilepsy and had a history of seizures.

---

been drinking. Brady also testified to additional details that were consistent with, but not included in, Rivera's trial testimony. Specifically, Rivera told Brady during the interview that Scherer had "gone to the Cooler [tavern] with Jessie a couple of times" and that Scherer "began crying and shaking" before she made her statements to Rivera.

On cross-examination, Smith testified that she was using methamphetamine at the time Scherer made her admissions to her. She also acknowledged that she was having difficulty separating what she had learned from Scherer directly from things Nicki and Angel had told her and other rumors.

Like C. Torres, Smith did not report what Scherer had told her to the authorities until January 2007. Smith explained that she did not come forward earlier because she was "in [her] addiction" and "wanted by the police."

The final hearsay witness, Callahan, testified that, sometime around the time of the murder, Scherer admitted to her that she had "stabbed somebody" after "the girl had jumped her," and that she was hiding from the police.[10] Callahan testified that this was the first time she had ever met Scherer and that Scherer never identified her victim by name or state where or when the incident occurred. Callahan testified that she did not ask Scherer for any more details because she "didn't really want to know no more." After the incident, Callahan testified she did not see Scherer again until "well into summertime," "[p]robably" about two months later.

On cross-examination, Callahan acknowledged that she was using methamphetamine at the time Scherer made that statement to her and that she "was trying not to" pay attention to what Scherer was saying. In fact, Callahan stated that she did not connect Scherer's confession to Valero's murder until she was in jail months later, in November 2006, when she overheard other inmates talking about Scherer's potential involvement. At that point, she disclosed what Scherer had told her. As was the case with C. Torres and Smith, nothing in the record discloses any relationship between Callahan and defendant or his alleged coperpetrators.

---

[10] On direct examination, Callahan testified that it was "March-ish" when Scherer made that statement. On cross-examination, Callahan acknowledged that she was "not exactly sure" and that, when examined previously (*viz.*, during the offer of proof in Reyes-Sanchez's trial), the best she could say was that "it was raining at the time," like "January through March."

As noted, defendant also called Scherer as a witness during his offer of proof. Scherer denied ever stabbing a woman or telling any of the witnesses that she had. She also denied ever meeting Valero or being at her apartment. She admitted, however, that she had lived in the Hillsboro area in March 2005, during the time of the murder, and had subsequently lived in Salem during April and May of that same year.

Scherer also testified about her relationships with the witnesses who gave testimony against her. Scherer confirmed that Smith was a family friend whom she has known for "all my life, almost." She also confirmed that she and C. Torres were "friends" and stated that she had also known C. Torres "all my life." Scherer likewise described Rivera as a "friend" whom she knew "[t]hrough the same crowd." Scherer denied ever meeting Callahan but admitted that it was possible that she could have met her, but never knew or no longer remembers her name. Scherer denied knowing Lugardo-Madero or ever attending a birthday party for him, and there is no evidence in the record that she had a relationship with defendant or Reyes-Sanchez.

Defendant argued that, when viewed collectively and in the context of other circumstantial evidence (*e.g.*, the testimony by Brady and B. Torres and the evidence of Valero's epilepsy), the testimony recounting Scherer's purported statements satisfied all the requisites for admission under OEC 804(3)(c) except for the declarant's unavailability as a witness. Defendant further contended that, in the totality of the circumstances, it would violate due process to preclude him from presenting reliable, materially exculpatory hearsay evidence based solely on declarant's availability. *See, e.g.*, *Holmes v. South Carolina*, 547 US 319, 126 S Ct 1727, 164 L Ed 2d 503 (2006); *Chambers v. Mississippi*, 410 US 284, 93 S Ct 1038, 35 L Ed 2d 297 (1973); *accord Thoma*, 313 Or at 279-83. The state countered that the hearsay testimony was inadmissible because Scherer was, in fact, available to testify, that her statements were not against her penal interest, and that, in all events, the hearsay evidence lacked the requisite indicia of trustworthiness for admission under OEC 804(3)(c) or, failing that, under principles of due process.

■    OEC 804(3)(c) states an exception to the hearsay rule, OEC 802, and applies when the hearsay declarant is shown to be "unavailable as a witness." Specifically, OEC 804(3) provides, in part:

> "The following are not excluded by [OEC 802] if the declarant is unavailable as a witness:
>
> "* * * * *
>
> "(c)   A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*"[11]

(Emphasis added.)

The trial court excluded the evidence on the alternative grounds that (1) Scherer was not "[u]navailab[le] as a witness," OEC 804(1),[12] and so the evidence did not meet the

___

[11] In *State v. Schutte*, 146 Or App 97, 101, 932 P2d 77 (1997), we summarized the requirements of OEC 804(3)(c):

"(1) The declarant must be 'unavailable' to testify as defined under OEC 804(1); (2) the statements must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statements unless he or she believed them to be true (the penal interest requirement); and (3) there must be corroborating circumstances that clearly indicate the trustworthiness of the statements."

[12] OEC 804(1) provides:

" 'Unavailability as a witness' includes situations in which the declarant:

"(a)  Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of a statement;

"(b)  Persists in refusing to testify concerning the subject matter of a statement despite an order of the court to do so;

"(c)  Testifies to a lack of memory of the subject matter of a statement;

"(d)  Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

"(e)  Is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means."

"threshold for admissibility" under OEC 804(3)(c); and (2) the trustworthiness of the evidence was not circumstantially corroborated. The trial court reasoned:

> "Well, first taking the Tiffany Scherer evidence. They don't meet the evidence code requirement for statements against penal interest. You know, to the extent that they—where she basically says that she killed someone or stabbed someone, that would be a crime. But it's not clear that it's Jessie Valero that she's talking about. And, you know, Tiffany Scherer is not unavailable. * * *

> "Secondly, the only two facts, independent facts, that have been brought out in this trial that would even potentially be corroborative of, you know, the fact that this, in fact, occurred were the statements of Anita Valero that her mother basically suffered from epilepsy, and in one of the statements that Tiffany Scherer is alleged to have made, there is reference to someone going into a seizure.[13]

> "And secondly, * * * Benilde Torres indicated that some period of time around the time of the murder * * * she saw something that appeared to be a scratch on Tiffany Scherer's neck * * *. That's the sum total of corroboration that's outside of the other statements.

> "You know, except for, I guess, the negative that nobody else—no other woman was stabbed, which really doesn't indicate necessarily the truth of the statement that somebody was stabbed. And for those reasons the offer of proof is not allowed on that point."

With the Scherer "alternative perpetrator" evidence excluded, defendant's predominant theory of defense was that, given alleged inconsistencies in the state's proof and the lack of forensic evidence implicating defendant, the state had failed to meet its burden of proof. The jury convicted defendant on all charges, but did not impose the death penalty. On the aggravated murder charge, defendant was sentenced to life imprisonment without possibility of release or parole. ORS 163.105(1)(b).

On appeal, defendant reiterates and refines the arguments that he made to the trial court regarding the

---

[13] The trial court misspoke. The victim's son, Ray Valero, not her daughter, Anita, testified that the victim had epilepsy.

admissibility of the Scherer hearsay testimony. *First*, defendant contends that the trial court erred in concluding that the hearsay statements were insufficiently corroborated so as to "clearly indicate the trustworthiness of the statement[s]." OEC 804(3)(c). In that regard, defendant emphasizes that multiple witnesses recounted inculpatory statements by Scherer, that those witnesses had no apparent motive (either because of affinity with defendant or hostility towards Scherer) to fabricate their accounts—and, indeed, three of the four were friends of Scherer's—and that, although the statements varied in inculpatory detail, some included particulars that were peculiar to this murder. *Second*, relying predominantly on *Holmes* and *Chambers*, defendant contends that excluding reliable, materially exculpatory evidence based solely on the hearsay declarant's, Scherer's, *availability* to testify violates due process.

The state responds that, as a statutory matter, the statements were inadmissible because Scherer was available to testify and because there was insufficient corroboration indicating the trustworthiness of the statements.[14] Additionally, the state contends that application of the unavailability requirement so as to preclude the admission of Scherer's inculpatory statements as substantive evidence was not so arbitrary or disproportionate as to violate due process.

Thus, as framed by the parties, defendant's due process-based argument is implicated only if the excluded testimony satisfies the corroboration/"trustworthiness" requirement for admission of statements against penal interest. Accordingly, we begin by addressing that question. *See, e.g.*, *State v. Nielsen*, 316 Or 611, 618, 853 P2d 256 (1993) (under "first things first" methodology, court is to consider potentially dispositive nonconstitutional contentions before addressing constitutional arguments); *Zockert v. Fanning*, 310 Or 514, 520, 800 P2d 773 (1990) (same). As explained below, we conclude that corroborating circumstances sufficiently indicated the trustworthiness of the proffered evidence for purposes of OEC 804(3)(c).

---

[14] The state, correctly, no longer disputes that the statements ascribed to Scherer were against her penal interest.

■■  Our analysis is predicated on a "two-part standard of review" that controls when we review a "trial court evidentiary ruling [as to whether] a statement fits within an exception to the hearsay rule." *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006). First, with respect to matters of historic fact pertaining to the content of statements and pertinent attendant circumstances, we will uphold the trial court's preliminary factual determinations if there is any evidence, including reasonable inferences, in the record to support them. *Id.*; *State v. Carlson*, 311 Or 201, 214, 808 P2d 1002 (1991). If the trial court does not make findings on pertinent facts, and there is conflicting evidence, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion. *Carlson*, 311 Or at 214 (citing *State v. Stevens*, 311 Or 119, 127, 806 P2d 92 (1991); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). Thus, for example, if there were conflicting evidence as to when, relative to the "startling event," a declarant made a statement for purposes of OEC 803(2), or whether a witness had a motive to falsely ascribe an inculpatory statement to the declarant under OEC 804(3)(c), we would presume that the trial court resolved those factual disputes consistently with its ultimate evidentiary ruling.

■  Second, with the material facts so fixed, we must determine whether, as a matter of law, the trial court's ruling comports with the requirements of the evidentiary rule. *See Cook*, 340 Or at 537 ("[T]he court reviews the trial court's ultimate legal conclusion, as to whether the hearsay statement is admissible under an exception to the hearsay rule, to determine if the trial court made an error of law."). In this case, that inquiry reduces to whether, in the totality of the circumstances (with disputed historic facts viewed consistently with the trial court's ruling), defendant's proffered evidence satisfied the purposes of the corroboration requirement.

■  As we have repeatedly observed, "[t]here is no magic formula to determine whether the corroboration requirement under [OEC 804(3)(c)] has been satisfied; each case must be decided on its own individual circumstances." *State v. Edwards-Peecher*, 218 Or App 311, 318, 179 P3d 746 (2008) (citing *State v. Lytsell*, 187 Or App 169, 180, 67 P3d 955

(2003)). Nonetheless, the legislature has provided some guidance. According to the legislative commentary to OEC 804(3)(c), *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 804.04[2], 841-42 (5th ed 2007), the corroboration requirement was intended to address the concern at common law that out-of-court statements offered to exculpate the accused are inherently suspect, especially where—as the rule requires—the declarant is unavailable to testify. Thus, corroboration is required before admission both to ensure that "either the fact or the contents of the confession [are not] fabricated" and because, after admission, "the situation * * * is not well adapted to control by rulings as to the weight of the evidence." *Id*. In that vein, courts are to construe the corroboration requirement "in a manner that effectuates its purpose to circumvent fabrication." *Id*.

◼    In sum, the corroboration requirement is a screening device designed to frustrate fabrication either by declarants seeking to falsely exculpate a criminal defendant or by witnesses who, by way of hearsay, falsely ascribe inculpatory statements to purported declarants. Given that overarching purpose, and the totality of material circumstances, we conclude that the trial court erred in determining that defendant's proffered hearsay evidence did not satisfy the corroboration requirement. *Accord Thoma*, 313 Or at 278-79 (concluding that the trial court had erred in determining that the described corroborating circumstances were insufficient to establish the trustworthiness of the alleged alternative perpetrator's inculpatory statements).

◼    In so concluding, as amplified immediately below, we rely primarily on three considerations: (1) Scherer told multiple witnesses in separate conversations that she had killed a female victim (who, in one instance, was identified as "Jessie") by stabbing her repeatedly—and Valero was the only woman who had been stabbed to death in Hillsboro in the relevant time period. (2) Of the four hearsay witnesses, three had no motive, including by way of relationship to either defendant or Scherer, to fabricate their accounts—and, indeed, one was a close friend and two others were friends of Scherer's—nor did Scherer have any reason, including any relationship with defendant or his alleged coperpetrators, to falsely claim responsibility for Valero's

murder. (3) Although Scherer's statements to the four hearsay witnesses varied in their degree of detail, they were consistent as to certain essential facts and, in several instances, related particulars that were peculiar to this crime.

First, defendant's offer of proof established that, on four separate occasions in the weeks and months following Valero's murder, Scherer independently confessed to four people, unrelated to each other, that she had stabbed a female victim to death. Scherer's repetition of her confession to separate people on four separate occasions itself gives corroborative weight to the witnesses' accounts. *See Thoma*, 313 Or at 278 (identifying as a persuasive corroborating circumstance that the alleged perpetrator "repeated his confession to three different people at three different times"). Moreover, there was no evidence that could otherwise explain the confluence of those witnesses' reports. There were no other murder cases in Hillsboro, proximate to Valero's murder, involving the repeated stabbing of a female victim. Nor was there evidence of any relationship between or among the hearsay witnesses to suggest that they had collaborated on their respective testimonies.

Second, as noted, Scherer denied knowing defendant, Reyes-Sanchez, or Lugardo-Madero, and the state did not adduce any evidence of such a connection. Absent such a connection between Scherer and defendant and his alleged coperpetrators, or other evidence of motive, there was no apparent reason for Scherer to falsely claim responsibility for Valero's murder. *See Thoma*, 313 Or at 278 (listing as corroborating circumstance that "[t]here was no known connection between" the defendant and the purported "alternative perpetrator" declarant); *cf. Edwards-Peecher*, 218 Or App at 318 (pointing to relationship between the defendant and her son, the purported "alternative perpetrator"—"a 13-year-old child living with [the defendant]" and "dependent on her for his support"—as a circumstance supporting exclusion of son's alleged hearsay statements (internal quotation marks omitted)).

Likewise, three of the four witnesses—C. Torres, Smith, and Callahan—had no apparent reason to lie about what Scherer had told them. There was no evidence that

those witnesses had any direct ties to defendant or his alleged coperpetrators, Reyes-Sanchez and Lugardo-Madero, or, correspondingly, had any motive to exculpate them by fabricating their testimony. On the contrary, C. Torres, Smith, and Rivera were friends of Scherer. C. Torres had known Scherer for at least five years and had a long-standing relationship with Scherer's mother, Tina. Similarly, Smith was a life-long family friend of Scherer's, whom Scherer sometimes referred to as "mom" or "Aunt Lisa." Callahan, who had no relationship to defendants or Scherer, had no apparent motive to exculpate the former or inculpate the latter. Only Rivera had an apparent motive to falsify her testimony, because, unlike the other witnesses, she and defendant were friends. However, the central elements of her testimony, as discussed below, were corroborated by the testimony of the other witnesses.

Nonetheless, the state contends that the statements are "suspect" because of the timing of the hearsay witnesses' revelations, which occurred in proximity to Reyes-Sanchez's trial in January 2007. In that regard, the state emphasizes that (1) Rivera first spoke with law enforcement in mid-December 2006 and (2) both C. Torres and Smith never disclosed Scherer's admissions until after Reyes-Sanchez's trial had begun. To be sure, the witnesses' accounts might well have been more powerfully circumstantially corroborated if they had contacted law enforcement authorities promptly upon hearing Scherer's purported admissions. Nonetheless, given the complete absence of a demonstrated connection between three of the four witnesses and defendant or his alleged coperpetrators, that timing does not substantially subvert the trustworthiness of the witnesses' accounts.

Indeed, at least with respect to C. Torres and Smith, the evidence discloses a persuasive, even compelling, explanation for the delayed reporting: Because of their friendship with Scherer, they had an incentive not to disclose her self-inculpatory statements—and did so only when confronted (because of the imminence of Reyes-Sanchez's trial) with the concrete prospect that others might be convicted, and potentially sentenced to death, for a murder that Scherer had committed. That is precisely the explanation C. Torres gave: She came forward after she learned that the state was seeking

the death penalty, because "I don't think somebody who's not guilty of doing something, I don't think they should get the death penalty for something that they didn't commit themselves."[15]

Third, although Scherer's statements to the four hearsay witnesses varied in certain particulars and in their degree of detail, they shared common elements that corresponded to the essential facts of the charged crimes. For example, Scherer's statements to Smith that "she stabbed [Jessie] 22 times," and to Rivera and C. Torres that she stabbed a woman "over and over and over again," and that "once she started * * * she couldn't stop," broadly correlated with the facts of Valero's murder (*e.g.*, Valero was stabbed 29 times). Further, in her statements to Smith, Scherer identified her victim as "Jessie" and correctly identified the victim's apartment as the location of the crime. Scherer's statements, to C. Torres and Smith, that she got scared and tried to make the murder look like a burglary and that she involved others in the cover-up, were reconcilable with the facts of the case. Finally, Valero had epilepsy—and Smith testified that either Scherer or another person had told her that the victim had gone into convulsions or seizures during the stabbing. A reasonable trier of fact could ascribe that statement evidencing knowledge of facts peculiar to this crime to Scherer—as, indeed, the trial court apparently did in its assessment of foundational corroboration. *See* 233 Or App at 322.

The hearsay witnesses' accounts also cross-corroborated one another. All referred to stabbing a female victim to death, and three referred to repeated or uncontrolled stabbing. Further, the four hearsay witnesses' accounts of *when* Scherer confessed to them were internally consistent and corroborated by Scherer's testimony about her whereabouts after the murder. After C. Torres and Callahan spoke with Scherer, around the time of the murder, they did not see her again until "a couple of months" later, which was consistent with Scherer's testimony that she left the Hillsboro area for

---

[15] As noted, Callahan explained that, because Scherer had not specifically identified whom she had stabbed, Callahan did not connect Scherer's statements to Valero's death until she overhead other inmates talking about Scherer's possible involvement in her murder. According to Callahan, once she made the connection, she promptly disclosed Scherer's purported statements.

Salem during April and May. That, in turn, corresponds with Scherer's statement to Callahan that she was hiding from the police. Then, several months after Valero's murder, apparently after Scherer had returned to Hillsboro, she confessed to Smith and, possibly, Rivera.[16]

The state contends, nevertheless, that other aspects of the record so subvert or contradict the hearsay witnesses' accounts as to preclude a determination that they possess the requisite trustworthiness for admissibility. We disagree.

First, the state emphasizes the forensic evidence, which the state contends demonstrates that Valero was attacked by two assailants—not one—who used two different weapons. However, the evidence in that regard is hardly uncontradicted. Specifically, although the state medical examiner testified that Valero's wounds were "consistent" with the use of two different weapons, he also agreed with defense counsel that "there's no way of knowing with any degree of medical certainty whether one weapon was used or two." Thus, the evidence, albeit supportive of the state's "two-assailant" (Reyes-Sanchez and defendant) theory of the cases, did not foreclose Scherer's purported "single-assailant" account.

Second, the state points to uncontested evidence contradicting Rivera's account in which Scherer allegedly said that she had stabbed a woman either during or after a birthday party for Lugardo-Madero that "Jessie" had hosted at her apartment. That evidence shows that, although Lugardo-Madero's birthday is March 15 (two days before Valero's body was discovered), Valero did not host a birthday party for him that day.[17] Although the date and location of the murder, as

---

[16] As noted, Rivera's testimony that Scherer made her admissions to her two or three months after Rivera learned of Valero's murder was undermined by other defense evidence, *viz.*, that she had said previously, in her interview with Brady, that Scherer made her admissions "about a week or less" after the murder. In either case, Rivera's testimony seems to comport with Scherer's account about her whereabouts during those times.

[17] Lugardo-Madero testified that he spent the evening before his birthday prowling for cars with defendant. He slept at his mother's house and, after rising at noon on his birthday, March 15, reconnected with defendant at the apartment of a mutual friend, Tory McLeod. According to Lugardo-Madero, he and defendant spent about five to six hours at McLeod's apartment and used methamphetamine there. Then, he and defendant left the apartment to track down a car that they intended to break into. When they were unable to locate the car, they returned to

described in Rivera's account, are consistent with the circumstances of the crime, the "birthday party" feature she ascribed to Scherer appears to be inexplicable and, at least, mistaken. Although that feature detracts from the trustworthiness of Rivera's account, in the totality of the circumstances of this case, including the compelling collective cross-corroboration offered by the other hearsay witnesses' accounts, that discrepancy does not justify excluding Rivera's account, much less defendant's hearsay evidence in its entirety.

Third, the state contrasts Scherer's use of the term "girl" to refer to the victim in her purported statements to C. Torres and Callahan, with the fact that Valero was a "middle-aged grandmother." With respect, given the vagaries and pliability of the vernacular, jurors could find that there is no necessary contradiction. In all events, as noted, Valero was the only female stabbing victim in Hillsboro during the pertinent period.

Finally, the state emphasizes that all hearsay witnesses were methamphetamine users and that some were under the influence of the drug at the time the statements were made, distorting their statements and recollections. We fully appreciate that jurors, in evaluating the credibility or accuracy of the hearsay accounts, may ultimately consider the effect of the participants' drug use on their perceptions and recall. Nevertheless, nothing in the record explains how or why methamphetamine abuse would cause a person to falsely admit to four other persons, on four separate occasions, that she had committed a murder or, conversely, why such abuse would cause disinterested witnesses to falsely ascribe such statements to an innocent person. That consideration goes, at most, to the weight, and not the foundational admissibility, of the proffered hearsay.

■ We thus conclude that, notwithstanding the countervailing considerations that the state posits, "corroborating

---

McLeod's apartment. Lugardo-Madero testified that he spent the rest of his day as recounted above. *See* 233 Or App at 313-14, 314 n 4.

The state's evidence established that, on March 15, Valero went to an orientation for her new job at Little Caesar's Pizza and then went shopping that afternoon. After she arrived home, she called and spoke with several friends on the phone.

circumstances clearly indicate the trustworthiness" of defendant's proffered hearsay evidence, OEC 804(3)(c), and that the trial court erred in determining otherwise. Further, it is patent that Scherer's purported statements "so far tended to subject [her] to * * * criminal liability * * * that a reasonable person in [her] position would not have made [them] unless the person believed [them] to be true." *Id.* Consequently, the inquiry reduces to whether the trial court erred in determining, alternatively, that Scherer's availability to testify precluded the admission of her purported inculpatory statements as substantive evidence. Specifically, given that Scherer's demonstrated availability precluded admission of her hearsay statements under OEC 804(3)(c), was defendant nevertheless entitled, under principles of due process, to present testimony recounting those statements as substantive evidence that Scherer, not defendant, had killed Valero?

As amplified below, we conclude that the trial court's exclusion of defendant's proffered reliable and materially exculpatory evidence "denied him a trial in accord with traditional and fundamental standards of due process." *Chambers*, 410 US at 302. *Chambers* and, by instructive contrast, *Thoma*, impel that conclusion.

In *Chambers*, the defendant, who had been charged with the murder of a police officer in Mississippi, sought to present a defense that another man, McDonald, had killed the officer. 410 US at 285, 289. That defense was predicated principally upon a sworn written confession by McDonald and on testimony from three witnesses that McDonald had told each of them that he had killed the officer. *Id.* at 289, 292-93. At trial, Chambers called McDonald as a witness and, by way of direct examination, introduced McDonald's confession. However, on cross-examination by the state, McDonald testified that he had previously repudiated his confession as fabricated and then gave a detailed account of an alibi. *Id.* at 291. When Chambers then sought to have McDonald designated as an adverse witness, so that he could cross-examine him regarding the purported reasons for recanting the written confession and the alleged alibi, the court refused to do so, invoking Mississippi's "voucher" rule by which a party who called a witness was deemed to vouch

for the truthfulness of his or her testimony. *Id.* at 291-92, 295-96.

Further, and of particular significance to our case, Chambers unsuccessfully sought to introduce testimony from the three witnesses who would have recounted the statements that McDonald had purportedly made to them confessing to the murder. *Id.* at 292-93. The trial court excluded that testimony, ruling that McDonald's purported statements were inadmissible under Mississippi's hearsay rule, which did not include an exception for statements against penal interest. *Id.* at 292-93, 299.

Chambers was convicted of murder. The Mississippi Supreme Court affirmed that conviction, rejecting Chambers's challenge to the trial court's evidentiary rulings. *Id.* at 291-93.

The United States Supreme Court reversed, concluding that the cumulative effect of the trial court's rulings excluding evidence of McDonald's guilt violated Chambers's due process right to present a complete defense. *Id.* at 285, 302. The Court first considered Mississippi's "voucher" rule, characterizing it as "doubly harmful to Chambers' efforts to develop his defense," *id.* at 296, because Chambers, by calling McDonald as a witness was (1) deemed to have "vouched" for McDonald's testimony, including his repudiation of the written confession and his denial of involvement in the murder, and (2) concomitantly was precluded from cross-examining McDonald as an adverse witness regarding that testimony. *Id.* at 296-97. The Court, after canvassing historical justifications for the "voucher" rule, concluded that the application of that rule "plainly interfered with Chambers' right to defend against the State's charges." *Id.* at 298.

The Court then addressed the exclusion of the three witnesses' testimony, which would have recounted McDonald's purported inculpatory statements. The Court prefaced that discussion by emphasizing that those statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. In that regard, the Court noted, *inter alia,* that each of the statements had been made "spontaneously to a close acquaintance shortly after

the murder had occurred"; that each confession was corroborated by some other evidence; that "[t]he sheer number of independent confessions provided additional corroboration for each"; and that "McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends." *Id.* at 300-01.

With the essential condition of reliability so confirmed, the Supreme Court concluded:

> "Few rights are more fundamental than that of an accused to present witnesses in his own defense. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.
>
> "We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process."

410 US at 302 (citations omitted).

We proceed to *Thoma*. In *Thoma*, the defendant, who was charged with murder, attempted to advance a defense that another man, Pierce, had killed the victim. 313 Or at 273-75. Before trial, the state moved to preclude the defendant from presenting evidence of Pierce's purported involvement, including testimony from three witnesses who would have recounted statements by Pierce claiming responsibility for the murder. *Id.* At the pretrial evidentiary hearing, the defendant, while making an offer of proof of those witnesses' putative hearsay testimony, did not attempt to

call Pierce as a witness; the only evidence at that hearing as to Pierce's (un)availability was testimony by a detective that Pierce was an inmate either at the Oregon State Penitentiary or the Oregon State Correctional Institution. *Id.* at 277.[18]

The trial court excluded the proffered evidence on the grounds that it was insufficiently corroborated to be admissible under OEC 804(3)(c) and that, concomitantly, it lacked the indicia of reliability prescribed in *Chambers. Id.* at 273. The jury subsequently convicted the defendant.

On appeal, the Oregon Supreme Court affirmed, concluding that the proffered evidence was not admissible under OEC 804(3)(c) or as a matter of due process under *Chambers*. With respect to OEC 804(3)(c), the Supreme Court rejected the trial court's rationale that the proffered hearsay evidence failed to satisfy the rule's corroboration requirement; indeed, the court cataloged specific indicia of trustworthiness, including the multiplicity and diversity of Pierce's self-inculpatory statements, the timing of those statements, and the lack of any relationship between Pierce and the defendant that might have motivated Pierce to fabricate such admissions. *Id.* at 278. Nevertheless, the Supreme Court concluded that the hearsay testimony was not admissible under OEC 804(3)(c) for the alternative reason that the defendant had failed to establish that Pierce was, in fact, "unavailable as a witness," as prescribed in OEC 804(3). *Id.* at 277-78. For example, the defendant did not show that Pierce's attendance could not be procured or that, "if called, Pierce would have exercised his privilege against self-incrimination and declined to testify." *Id.* at 277. Thus, notwithstanding that the proffered hearsay evidence was otherwise "sufficient to submit to a jury," *id.* at 278, the defendant's failure to establish the declarant's unavailability precluded its admission under OEC 804(3)(c).

The Supreme Court then addressed the defendant's alternative *Chambers*-based argument—*viz.*, that "even if he failed to lay a proper foundation for admission of Pierce's hearsay statement[s] * * * he nonetheless had the right to

---

[18] The prosecutor in *Thoma* also represented to the court that a "transport order" for Pierce had been prepared. *Id.*

introduce that testimony under the Due Process Clause of the Fourteenth Amendment." *Id.* at 279.

The Supreme Court began by describing *Chambers* in detail, akin to our discussion above. *Id.* at 279-82. It then concluded:

> "Our extensive summary of the *Chambers* decision makes it clear why that case does not aid defendant here. Pivotal to the case was the fact that, under Mississippi law, the exculpatory hearsay testimony was not admissible *in any case*. That is, no matter how reliable the evidence might be shown to be, it would not have been admitted. Such an unyielding rule denied criminal defendants due process.

> "As previously demonstrated, Oregon's rule is not so unyielding. Before a criminal defendant can invoke the Due Process Clause, he or she must show that the state's law denies the process claimed to be due. In terms of this case, to be admissible under the due process rule of *Chambers*, the evidence must be inadmissible under the Oregon Evidence Code. Defendant has not made such a showing of inadmissibility here. There has been no violation of his rights under the Constitution of the United States."

*Id.* at 282-83 (citations omitted; emphasis in original).

Thus, as rendered in *Thoma*, *Chambers*'s *sine qua non* is that the proponent of reliable, materially exculpatory evidence must demonstrate that state law completely precludes the admission of that evidence. That is, state law affords no common law or statutory basis on which that evidence could be admitted. Because the defendant in *Thoma* failed to establish that the declarant, Pierce, was *not* "unavailable," he failed to foreclose the possibility that the hearsay evidence could have been admitted under OEC 804(3)(c).[19] Consequently, *Chambers* was inapposite.

---

[19] The reasoning is precise and, practically, paradoxical: If the defendant in *Thoma* had shown that the declarant was "unavailable," the exculpatory hearsay evidence would have been admissible under OEC 804(3)(c). Conversely, if the defendant had shown that the declarant was *not* "unavailable" (*i.e.*, available), the evidence would have been admissible, as a matter of due process, under *Chambers*, because the defendant would have shown that it was not admissible under OEC 804(3)(c) and, hence, was not admissible under Oregon evidentiary law. However, the defendant failed to make either showing and, thus, failed to exclude the possibility that Pierce was, in fact, "unavailable as a witness," and that (upon a proper showing of that foundational fact) the evidence could have been admitted under OEC 804(3)(c).

In sum, the Supreme Court's rejection of the defendant's *Chambers*-based due process argument in *Thoma* was based exclusively on the defendant's failure to establish that the declarant was not unavailable to testify. The totality of the court's analysis, and particularly its validation of the reliability of the proffered hearsay, attests that, but for the defendant's failure in that regard, that evidence would have been admissible under *Chambers*.

■     Here, defendant made precisely the showing that was missing in *Thoma*. In his offer of proof, defendant called Scherer, who, rather than invoking any privilege, testified and denied that she had been involved in Valero's death or had made the purported self-inculpatory statements. Thus, in dispositive distinction from *Thoma*, defendant, as the proponent of reliable, materially exculpatory hearsay evidence, established that the declarant was not "unavailable as a witness." OEC 804(3). Consequently, unlike in *Thoma*, defendant showed that the proffered testimony could not have been admitted under OEC 804(3)(c). Further, the state does not contend that the excluded testimony could have been admitted as substantive evidence under any other provision of the Oregon Evidence Code.[20] Accordingly, defendant established the requisites for admissibility under *Chambers*, and the trial court, by excluding that evidence, denied defendant "a trial in accord with traditional and fundamental standards of due process." *Chambers*, 410 US at 302.[21]

---

[20] The state suggests, in passing, that the excluded statements might have been admissible for impeachment purposes, *i.e.*, to impeach Scherer's denials, if defendant had called Scherer as a witness at trial. However, that suggestion cannot be reconciled with Oregon's adoption of the "primary purpose" rule, which precludes a party from calling a witness for the primary purpose of exposing the trier of fact to otherwise inadmissible hearsay testimony. *See State v. Warren*, 88 Or App 462, 466-67, 745 P2d 822 (1987), *rev den*, 305 Or 45 (1988) (adopting the "primary purpose" rule from *United States v. Hogan*, 763 F2d 697, *withdrawn in part on other grounds*, 771 F2d 82 (5th Cir 1985)); *accord State v. Swett*, 158 Or App 28, 33-34, 972 P2d 909, *rev den*, 328 Or 595 (1999); *see also* Kirkpatrick, *Oregon Evidence* § 607.03[4] at 475-77 (discussing potential abuses of OEC 607, which permits a party to impeach its own witness, and discussing authority for limits on impeaching a party with prior inconsistent statements). Further, in all events, admission for purposes of impeachment is qualitatively different from admission as substantive evidence.

[21] *Cf. People v. Oxley*, 64 AD3d 1078, 1083-84, 883 NYS2d 385 (2009) (where alleged alternative perpetrator of murder "was available to give testimony and actually testified, albeit outside the jury's presence," rendering his alleged

■      That error was not harmless. A federal constitutional error is harmless " 'if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " *Cook*, 340 Or at 544 (quoting *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986)). In making that assessment, and taking into account all properly admitted evidence, we consider the "importance" of the improperly excluded evidence to defendant's case, the "presence or absence of evidence corroborating or contradicting" the evidence on "material points," and "the overall strength of the prosecution's case." *Id.* (quoting *Van Arsdall*, 475 US at 684).

■      Here, we cannot "confidently say" that the trial court's exclusion of defendant's proffered evidence was harmless beyond a reasonable doubt. That evidence was central to defendant's putative "alternative perpetrator" defense; it explicitly implicated Scherer as the true perpetrator of the murder for which defendant was charged and ultimately convicted. That evidence was substantial and, as addressed in detail above, sufficiently substantiated as trustworthy by corroborating circumstances. Multiple witnesses, including those with no discernible motive to lie, would have testified that Scherer had confessed to them that she had killed a woman—whom she identified to one witness as "Jessie"—by stabbing her repeatedly.[22] To be sure, those witnesses' accounts varied in some particulars, but those inconsistencies were, for the most part, marginal or potentially reconcilable. Further, jurors could find, based on one account (Smith's) that Scherer knew peculiar details of the crime (*e.g.*, that Valero had suffered an epileptic seizure) that the perpetrator would have known. Finally, although the state's evidence of defendant's guilt was strong—and indisputably sufficient to establish defendant's guilt beyond a reasonable

out-of-court inculpatory statements inadmissible under New York's exception to the hearsay rule for declarations against penal interest, the trial court's exclusion of those statements, which "bore persuasive assurances of trustworthiness" and were "critical to [the] defense," was erroneous under *Chambers* as "infring[ing] on defendant's weighty interest in presenting exculpatory evidence, thus depriving him of a fair trial" (internal quotation marks omitted)).

[22] Again, it is undisputed that Valero was the only woman who had been stabbed to death in Hillsboro during the relevant time period.

doubt—there was no direct DNA or forensic evidence linking defendant to the crime.

Given the totality of those circumstances, the error was not harmless with respect to defendant's convictions for murder. Further, given the inextricable interrelationship between the other charges on which defendant was convicted and the alleged murder, the exclusion of the proffered "alternative perpetrator" evidence was not harmless with respect to those convictions as well. Accordingly, a remand for a new trial on all charges is required.

Reversed and remanded.